PEOPLE'S GAS CO. et al. v. DEAN.

(Circuit Court of Appeals, Eighth Circuit. November 28, 1911.)

No. 3,473.

1. MINES AND MINERALS (§ 78*)—OIL AND GAS LEASE—IMPLIED COVENANT FOR REASONABLE DILIGENCE.

Where an oil and gas lease granted for a nominal expressed consideration gives the lessee the right to explore and develop the property and operate wells thereon without limitation as to time, but provides for substantial royalties to be paid the lessor in kind or money for all oil or gas removed from the premises, although it fixes no definite time within which a well must be completed and requires the payment of but a small sum per acre annually so long as the work is deferred, there is an implied covenant on the part of the lessee to develop the property and operate the wells drilled thereon with reasonable diligence and in good faith, which is manifestly the real consideration for the contract.

[Ed. Note.—For other cases, see Mines and Minerals, Cent. Dig. §§ 205–207; Dec. Dig. § 78.*]

2. MINES AND MINERALS (§ 78*)—OIL AND GAS LEASE—BREACH OF IMPLIED CONDITION—RIGHT OF LESSOR TO ENFORCE FORFEITURE.

Where the lessee in an oil and gas lease under which it agreed to pay royalties took no steps to develop the property for nearly six years and until more than two months after a notice of forfeiture from the lessor, and then drilled a well which it immediately capped and did not operate, although it found gas in paying quantity, and had during the preceding time operated wells on three sides of the land, the lessor was entitled in equity to a cancellation of the lease notwithstanding the payment by the lessee of small stipulated annual rentals for the delay.

[Ed. Note.—For other cases, see Mines and Minerals, Cent. Dig. §§ 205–207; Dec. Dig. § 78.*]

Appeal from the Circuit Court of the United States for the District of Kansas.

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Suit in equity by Louise Dean against the People's Gas Company and the Springfield Oil Company. Decree for complainant, and defendants appeal. Affirmed.

· Eugene Mackey (C. E. Benton and John J. Jones, on the brief), for appellants.

John H. Crain (Charles D. Welch, on the brief), for appellee.

Before HOOK, Circuit Judge, and RINER and WM. H. MUNGER, District Judges.

RINER, District Judge. This was a bill in equity filed by the appellee, hereafter called the "complainant," against the appellants, hereafter called the "defendants," to quiet her title to the S. ½ of the S. E. ¼ of section 7, township 34, range 16 E. of the Sixth principal meridian, by decreeing the cancellation of an oil and gas lease which the bill avers is a cloud upon the complainant's title.

June 26, 1900, Charles Mavers and Mary Mavers, the then owners of the land above described, executed an oil and gas lease to the Kansas Oil & Gas Company in the following words:

"In consideration of the sum of one dollar, the receipt of which is hereby acknowledged, Charles Mavers and Mary Mavers, his wife, first parties, hereby grant unto the Kansas Oil & Gas Company, a West Virginia corporation, second party, successors or assigns, all the oil and gas in and under the following described premises, together with the right to enter thereon at all times for the purpose of drilling and operating for oil, gas or water, and to erect and maintain all buildings and structures, and with the exclusive right to lay pipes on and across said premises, and to construct telephone lines for the production, operation and transportation of oil and gas, also the right to use the highways adjoining any part of said premises for the laying of pipes and mains and the construction of telephone lines for the transportation of gas or oil, and for the operation of gas and oil wells. Excepting and reserving, however, to first party the one-eighth part of all oil produced and saved from said premises, to be delivered in the pipe line with which second party may connect their wells.

"All that certain lot of land situated in the township of Fawn Creek, county of Montgomery, in the state of Kansas, bounded and described as follows, to wit:

"The S. ½ of the S. E. ¼ section 7, township 34, range 16 east being eighty acres, more or less.

"To have and to hold the above premises on the following conditions:

"If gas only is found, second party agrees to pay one hundred dollars for each well producing 5,000,000 cubic feet each 24 hours, and fifty dollars for all wells under that amount, each year, payable semiannually, upon the first day of January and the first day of July, and shall be paid within ten (10) days of the maturity thereof, for the product of each well while the same is being used off the premises, the first party to have gas free of cost to heat all stoves in dwelling house during the same time, but shall lay and maintain the service pipe at his own expense and use said gas at his own risk.

"Whenever first party shall request it, second party shall bury all oil and gas lines, and pay all damages done to growing crops by reason of burying and removing said pipe lines.

"No well shall be drilled nearer than 350 feet to the house or barn on said premises, and no well shall occupy more than one acre.

"In case no well is completed within one year from this date, then this grant shall become null and void, unless second party shall pay to said first party twenty dollars for each year such completion is delayed. ·Said payments shall become due semiannually, upon the first day of January and the first day of July and shall be paid within ten (10) days thereafter.

"The second party shall have the right to use sufficient gas, oil or water, to run all necessary machinery for operating said wells.

"If the party of the second part fails to comply with the terms and conditions herein or fails to pay the compensation herein stipulated to be paid, then in consideration of the payment by the party of the second part to the party of the first part of the sum of one dollar and the release of record of this lease, the rights of both parties hereunto shall cease and determine, except that the second party shall have the right, without paying any further consideration therefor, to maintain, operate and repair and replace or to remove any pipe lines, or other property laid upon said premises.

"It is understood between the parties to this agreement that all conditions between the parties hereunto shall extend to their heirs, executors and assigns.

"In witness whereof, the parties hereto have hereunto set their hands and seal this 26th day of June, A. D. 1900.

"Signed, sealed and delivered in the presence of Fred N. Neely.

"Charles Mavers.	[Seal.]
her
"Mary X Mavers.	[Seal.]"
mark

October 22, 1901, Mavers and wife executed the following supplemental agreement: .

"It is hereby agreed between the parties to this lease that the party of the second part may deliver gas within fifty feet of the residence now on this lease and the said first party shall accept gas delivered at this point instead of rental provided for in this lease.	Oct. 22, 1901.	"Charles Mavers.
her
"Mary X Mavers."
mark

December 23, 1901, Charles Mavers (his wife not joining therein) executed the following supplemental agreement:

"Contract.

"We, the undersigned, the lessors in a certain oil and gas lease, dated June 26, 1900, made, executed and delivered by us to Kansas Oil & Gas Company, thereby leasing to ——, said Kansas Oil & Gas Company, heirs and assigns, upon the terms and conditions in said lease stated, the following described lands situated in Montgomery county, Kansas, to wit: The S. ¼ of the S. E. ¼ of section 7, township 34, range 16, containing eighty acres, more or less, which said lease was on the 19th day of July, 1900, duly recorded in the office for recording deeds in and for Montgomery county, Kansas, in Book No. 50 of Deeds, at page 275, do hereby acknowledge and agree that the said Kansas Oil & Gas Company, in said lease has fully complied with all the terms and conditions on its part to be done and performed under said lease, they having piped gas within fifty feet of residence on said premises, and furnished, and furnishes, all gas for use, as in said contract is stipulated, and said lease is in full force and effect, and shall so continue in full force and effect as long as the said lessee, or his assigns, shall continue to furnish gas for all stoves and all lights in the residence in the said lease mentioned.

"And it is further understood and agreed, that, to make the said lease more definite and certain as to the time of payment of any and all royalties that may accrue under said lease, and become due to the lessors, their heirs and assigns, it is stipulated as an addition to said lease, and to be construed as part of said lease, as follows: That any and all royalties due, or to become due, under said lease, shall be payable upon demand of the lessors, their heirs or assigns.

"And the said Charles Mavers, lessor in said lease above mentioned, hereby assents and agrees to the above and foregoing modifications and additions to said lease.

"Witness our hands this 23 day of December, 1901.

"Charles Mavers."

And on January 17, 1902, Mavers and his wife executed a third supplemental agreement in the following words:

"Supplemental Agreement.

"It is hereby agreed by and between the parties to the within lease, that the party of the second part may lay a pipe line to a point within fifty feet of the dwelling house on the premises described and may deliver gas thereto ; and when gas is so delivered, said party of the first part shall accept, and does hereby agree to accept, such delivery of gas, together with the right to use said gas in three stoves and in six Welsbach lights, in said dwelling house, in lieu and payment of the cash rental provided for in the within lease; and said second party to have the right to pay cash or gas service rental, at the option of said second party.

"Charles Mavers.<br>her<br>"Mary X Mavers."<br>mark

April 28, 1906, Mavers and wife conveyed the property by war-ranty deed to complainant, and on December 11, 1906, she filed the bill in this suit. The defendants are the owners and holders, by proper assignments, of the lease and supplemental agreements in controversy. An examination of the record satisfies us that at the time the complainant purchased the land she accepted the conveyance with full knowledge of the execution by Mavers and wife of the lease and supplemental agreements above set out.

[1] No well was drilled within the year provided in the lease, and the master found that no payments for an extension of time were made. It is admitted that as to this matter the master was in error, for the evidence clearly shows that at the expiration of the year, or just prior thereto, there was tendered by the then holders of the lease, and accepted by Mavers, the sum of $10, which under the terms of the agreement would extend the lease for a period of six months from June 26, 1901. The evidence shows that Mavers used gas in his residence, as provided in one of the supplemental agree-ments, up to December 19, 1905, when he disconnected it, and on December 21, 1905, served a written notice on the defendants that he would not proceed further under the lease and declared the lease forfeited. It further appears in evidence that either in the fall of 1904 or 1905 (just which year is not clear) M. A. E. Patton, for the People's Gas Company, offered to drill one well or pay $100, and this offer was the only act of the defendants tending to show a dis-position to develop the property until the 5th of February, 1906, when the People's Gas Company tendered Mavers $20 which was refused. and on the following day, the 6th of February, the defendants com-menced drilling on the land and completed one well some time in April of the same year, and this well they at once "capped" upon its completion and have never used gas therefrom. Neither did they pay or offer to pay the $100 provided for in the lease, or any part of it, semiannually or otherwise, although substantially a year elapsed between the time the gas was disconnected by Mavers and the bring-ing of this suit by complainant. The evidence shows that upon ad-joining and adjacent land upon three sides of the complainant's prop-

erty, producing gas wells were being operated by the defendants and gas taken therefrom in large quantities.

When we come to examine the lease or contract under consideration, we think it perfectly clear that it was made for the purpose of exploring and developing the land for gas and oil. While the consideration was primarily $1, it is very evident from the terms of the contract that the prospective benefits and profits from gas or oil were the real and vital considerations moving the contracting parties. As was said by the Supreme Court of Indiana, in the case of Hancock v. Diamond Plate Glass Co., 37 Ind. App. 351, 75 N. E. 659:

"To the landowner the manifest inducement was the rent and royalties he expected to enjoy if the gas company should find gas or oil in paying quantities; to the gas company the right to exclude others from the premises it should drill. It will not do to believe that the landowner would for the pittance of 50 cents per acre per annum have knowingly incumbered his land, situate in the gas district, and thereby reduced its selling value by transferring, for an indefinite period, and for speculative purposes, the right to enter at the pleasure of the grantee or his assignee and mine the underlying gas or oil, or that he would have bargained away his prospects for large gains from the gas and oil under his land, with the knowledge that the same would be extracted through wells on other premises, and that his profits would be limited to the annual acreage rent during the process of extraction."

And this court in Brewster v. Lanyon Zinc Co., 140 Fed. 801, 72 C. C. A. 213, speaking through Mr. Justice Van Devanter, then Circuit Judge, in considering a lease similar in many respects to the lease now under consideration, held that, after the period prescribed for original exploration, if oil and gas or either were found to exist in paying quantities, the work of exploration, developing, and production should proceed with reasonable diligence for the common benefit of the parties or the premises be surrendered to the lessor. In the course of the opinion the court said:

"That this was of the very essence of the contract is shown by the extensive character of the grant, which was without limit as to time and included all the oil and gas in or obtainable through the demised premises; by the provisions for the payment of substantial royalties in kind and in money on the oil produced and saved and the gas used off the premises, which, as contrasted with the consideration paid when the lease was executed, shows that the promise of these royalties was the controlling inducement to the grant, and by the provisions contemplating the drilling and operation of wells, the production and transportation of oil and gas and the prosecution of that business subject to the restrictions prescribed.

"Considering the migratory nature of oil and gas, and the danger of their being drawn off through wells on other lands if the field should become fully developed, all of which must have been in the minds of the parties, it is manifest that the terms of the lease contemplated action and diligence on the part of the lessee. There could not well have been an express stipulation as to the number of wells to be drilled, or as to when the wells, other than the first, should be drilled, or as to the rate at which the production therefrom should proceed, because these matters would depend in large measure upon future conditions which could not be anticipated with certainty, such as the extent to which oil and gas, one or both, could be produced from the premises, as indicated by the first well and any others in the vicinity, the existence of a local market or demand therefor or the means of transporting them to a market and the presence of wells on adjacent lands capable of diminishing or exhausting the supply in the natural reservoir. The subject was, therefore, rationally left to the implication, necessarily arising in the absence of express

stipulation, that the further prosecution of the work should be along such lines as would be reasonably calculated to effectuate the controlling intention of the parties as manifested in the lease, which was to make the extraction of oil and gas from the premises of mutual advantage and profit. Even in respect to the first well, if oil or gas was found in paying quantity, there was no express engagement to operate it; but that it was intended to be operated was plainly implied in the engagement to pay royalties to be gauged according to the production of oil and the use of gas. Whatever is necessary to the accomplishment of that which is expressly contracted to be done is part and parcel of the contract, though not specified"—citing Godkin v. Monahan, 83 Fed. 116, 27 C. C. A. 410, and other cases.

And in the same case it is said:

"By reason of the conditions on which the lease is granted, the lessor retains at least a contingent interest in the oil and gas, to the profitable extraction of which the operations are directed. This interest in the subject of the lease, and the fact that the substantial consideration for the grant lies in the provisions for the payment of royalties in kind and in money on the oil and gas extracted, make the extent to which and the diligence with which the operations are prosecuted of immediate concern to the lessor. If they do not proceed with reasonable diligence, and by reason thereof the oil and gas are diminished or exhausted through the operation of wells on adjoining lands, the lessor loses, not only royalties to which he would otherwise be entitled, but also his contingent interest in the oil and gas which thus passes into the control of others. The object of the operations being to obtain a benefit or profit for both lessor and lessee, it seems obvious, in the absence of some stipulation to that effect, that neither is made arbiter to the extent of which or the diligence with which the operations shall proceed, and that both are bound by the standard of what is reasonable. * * * There can therefore be a breach of the covenant for the exercise of reasonable diligence, though the lessee be not guilty of fraud or bad faith."

[2] This contract or lease was entered into in June, 1900, and no steps whatever were taken toward exploring or developing the land for gas and oil until February, 1906, and more than two months after they had been notified by Mavers that the contract was forfeited and that he declined to proceed thereunder. Even if it be conceded that the payment of the $10, and under the supplemental agreements the taking of gas in lieu of money, extended the time for exploration and development, they would not be entitled to relief. The most that can be said is that these payments, whether in money or in gas, simply put life anew in the contract from year to year, for it is evident from the very terms of the contract that it was not the understanding or intention of the parties to extend to the lessee indefinitely the right to begin exploring. In other words, at the expiration of the year the lessors might extend the time by accepting the payments or declining to accept them at their option. There being no definite time fixed by the contract within which a well must be completed, the law supplies this omission by declaring that it shall be accomplished within a reasonable time, meaning within a reasonable time at the option of the landowner. For more than five years the defendants held this lease and made no effort whatever to explore or develop the property and make no pretense to any excuse for not having performed the contract other than the mere fact that they paid to the lessor the sum of 25 cents per acre or its equivalent annually, while at the same time they were operating wells on every side of his land

and taking from him, without paying the royalties provided for in the contract, the gas from under his land.

The course taken by the defendants not only shows a lack of diligence but a wanton disregard of the lessor's rights, and they are in no position to ask relief at the hands of a court of equity. But even if the court could find that the defendants had proceeded within a reasonable time after the forfeiture of the lease by the lessor, yet in view of the facts disclosed by the record they would have no standing in court for, on completion of the well drilled upon complainant's premises in February, they not only failed to use the gas off the premises, but, on the contrary, at once capped the well to prevent the gas from escaping, and neither paid nor offered to pay the royalties provided for in the lease. Neither did they proceed with any further development, although the record shows that they found gas in paying quantities, so that, in any view we may take of the case, the decree of the court below was right, and it is affirmed.·