PURSEL et al. v. READING IRON CO.

(Circuit Court of Appeals, Third Circuit. June 7, 1916.)

No. 2092.

1. MINES AND MINERALS ⊕═66—MINING LEASES—TERMINATION BY CONSENT.
By a contract of lease the lessee acquired the ore under a tract of land with the right to mine the same. The lease provided for the payment of a minimum annual royalty, that it might be terminated by either party at any time by a written notice, and that on payment of the royalty due on its termination the lessee should have the right to remove its plant, machinery, and other property from the premises. After operating the mine for a number of years it became unprofitable and was abandoned, the lessee paying the royalty due to that time, removing all its plant and machinery, and a railroad built to the mine; no objection being made by the lessors, who went into possession and afterward sold stone which had been used in construction of the railway. No rent or royalty was thereafter paid or demanded for 20 years, and until after the death of the original lessors and the dissolution or insolvency of the lessee corporation. *Held*, that it was a fair inference from the facts and conduct of the parties that the lease was terminated by mutual consent, and that there was no further liability for rentals.

[Ed. Note.—For other cases, see Mines and Minerals, Cent. Dig. §§ 185, 186; Dec. Dig. ⊕═66.]

2. WORDS AND PHRASES—"OUSTER"—"DISPOSSESSION."
The essential idea of "ouster" is "dispossession," which in turn means ejectment or exclusion of one from the realty, against his interest and without his consent.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Ouster.]

In Error to the District Court of the United States for the Eastern District of Pennsylvania; Oliver B. Dickinson, Judge.

Action at law by Henry W. Pursel, Parker C. Pursel, Lina P. Sawyer, and Margaret A. Dawson against the Reading Iron Company. Judgment for defendant, and plaintiffs bring error. Affirmed.

The following is the opinion of Dickinson, District Judge, on final hearing:

Our first duty is to make clear the status of this cause as a pending case. An attempt was made to agree on a case stated upon which the ruling of the court could be asked. The attempt failed because of the inability of the parties to agree upon all the facts. The case has now taken form or is heard as if it were an agreement for an amicable action, tried by the court under the provision of the Revised Statutes, without the intervention of a jury, with the added feature of a stipulation of all the facts, except those which are in controversy. The evidence consists of the admission of some of the facts and evidence and testimony bearing upon the facts in dispute.

### The Character of the Controversy.

The case belongs to that large class of controversies the necessity of the intervention of the court in which would not be anticipated. The controversy is over the existence of the obligations of a contract which either party might have terminated practically at will. The obligation was born in 1862, and has shown no signs of life since 1889, except that an effort was made to galvanize it into life through an action in the state court. Had the contract not been made under the formality of a seal the statute of limitations would have given it its quietus three times over.

⊕═For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

### The History of the Case.

Part of the cost of this litigation is that any one interested in it will be obliged, or at least must be given the option, to read a somewhat lengthy historical narrative. The history of the case properly begins with the statement of the facts that in 1862 Daniel Pursel owned a tract of undeveloped ore lands, situate in Montour county, Pennsylvania, and Isaac S. Waterman and another were interested in the Pennsylvania Iron Company, which was the operator of certain furnaces for smelting ores. The furnaces were located near the Pursel lands, and were the only furnaces in that locality. Having thus a common business interest, the parties entered into the contract which is the basis of this action. For present purposes, it will suffice to say that under this agreement Waterman acquired whatever ore there was on the lands and undertook to mine it. It will be observed that the rights of the landowner thus became, like ancient Gaul, divided into three parts. Pursel retained what may be termed the surface rights. Waterman acquired all the mineral rights. Pursel in turn had the right to receive whatever became due under the contract. The interest not granted by Pursel was clearly a real estate interest. Whether the other interests were estates in land need not be decided. It is also to be noted as bearing upon one feature of the case that the Pennsylvania Iron Company was the owner and operator of the furnaces. An agreement in writing, under seal, and subsequently recorded, was entered into June 27, 1862. The owner of the furnaces was not a party to this agreement.

We will first find what the contract was and how it was subsequently modified, and will then endeavor to trace its life history, in the first instance, as if there had been no change in the original parties to it. An effort will be made to trace this history down to the commencement of this action if, as plaintiffs vigorously asseverate, it be still alive or will endeavor to learn the date of its demise and find the place of its interment if, as defendant asserts, it has long since been dead and buried. We will next follow the chain of title to these several interests and to the furnaces in order to show the relations of the parties, plaintiffs and defendant, to the original parties to the contract and to its subject-matter and how far they are privies in person or estate. We will finally give a number of minor facts as to which evidence has been produced or which counsel have discussed as having a bearing upon the questions involved in the case. Many of them, however, are of little and some of them of no evidential value.

The ores upon these lands were of three kinds or qualities. One of them is called the soft ore, another the hard—limestone—ore, and the other is undesignated. The hard ore is found at the lower levels. For convenience we call the parties to the contract lessor and lessees. The lessor granted to lessees, in addition to the ore and the right to mine it, the right to occupy and use parts of the property for the construction of its mining plant, and for railroads and other roads, and to take timber and other material required for mining operations. The lessees agreed to take out the ore through a slope, the construction of which was provided for, and to pay a fixed price by way of rental or royalty per ton for the ore taken out. There was a different price fixed for each kind of ore. There was a further minimum quantity of mine output requirement of 5,000 tons per annum for which they were to make advance payment at the highest price per ton. The contract was fairly and clearly drawn. There is nowhere in it a doubtful meaning. The parties had in contemplation three contingencies. The ores might become exhausted, or what was the same thing, could not be profitably worked. The lessees might not be able to have the ore smelted without shipping it a prohibitive distance. The lessees might default in payment. A like protection was given against any one or all of them by providing that the contract might be ended upon notice by either party. If the furnaces shut down, the minimum quantity requirement was proportionately reduced. If the mines were abandoned the lessees might reserve all of their property upon making full settlement to that date.

The contract was in such form as to be within the recording acts and was in fact promptly recorded. If, therefore, the lessees exercised their right of cancellation by anything short of a clear and unequivocal act, the recorded

deed might leave a cloud upon the title of lessor. It was, therefore, provided that the act of cancellation, if by lessees, could be made effective solely by giving the formal written notice prescribed and following this with a reconveyance. The lessor, however, might cancel by simply posting notice on the premises and could then exercise his right of ouster and retake possession of the whole property as it was in him before indenture made. The agreed and all necessary preparations for mining were made by the lessees, and mining operations were carried on in compliance with their contract for a period of over twenty years. By this time the deposits of ore in sight had been exhausted or the end of profitable operations had been otherwise indicated. In the right to declare a cessation the parties had a motive and inducement to meet any new situation in an accommodating spirit. This disposition was manifested by a new or modifying agreement which was entered into under date of February 16, 1883. The fact of the old agreement is recited. The further fact is disclosed that the old workings were about exhausted and that nothing but the extension of the old slope and the opening up of deposits of the hard limestone ore and the reduction of the royalty would make the mine worth further working. The old agreement was in consequence modified in several of its features. Those with which we are now concerned are these:

The minimum quantity requirement was suspended until 1885. The royalties were reduced, and other now past concessions were made to the lessees in consideration of the extension of the slope by them. In all respects not changed the old agreement was declared to be in force. The lessees made the extension, and the mining operations were resumed, or rather, continued until June, 1889. The accounts were then settled in full to that time, and all further mining ceased. Payments which were made after the new agreement was entered into were made on the basis of ore actually taken out. For a part of the time less than the minimum quantity was mined. The difference, however, was not large. Why the minimum was not exacted the evidence does not disclose. It is as likely to have been thought of no consequence either because of the smallness of the amount or because it would be allowed for anyhow through an increased output as because the lessor thought he could no longer claim a minimum. Moreover, we do not know whether the furnaces were out of blast and the minimum had been thereby reduced. From the time the June, 1889, settlements were made not only was no mining done, but this was followed up in September with the dismantling of the mining plant and the removal of all of the property of the lessee, and this in turn, later on, beginning in 1891, with the dismantling of the furnaces. Since 1889 the property has been an abandoned mine property. No payments of royalties were made and none demanded from that day to this except that in May, 1909, suit was brought in the county courts of Montour county by one claiming to be the administrator of Daniel Pursel, and, of course, by the bringing of the present action. In the Montour county action three defenses were interposed. One was a denial of a right of action in the administrator. The second a denial that the plaintiff was the administrator. The third a defense to the merits which, for the present purposes, may be stated to be that now interposed including an averment that the agreement was a dead thing. The case went off upon a variance in allegata and probata. The original statement based the right of action upon the agreement of 1862. It was amended so as to base the claim upon the agreement of 1883, which disclosed that the right of action was in the heirs of Daniel Pursel. The action was by the administrator, and the right of action averred to be in him. The proofs showed a right of action in the heirs. The case reached the Supreme Court of the state, and may be found reported in Pursel v. Reading Iron Co., 236 Pa. 79, 84 Atl. 659.

Nothing was afterwards done by the plaintiff until the bringing of the present action in 1914. Title to the interest of the lessor in the mining agreement of 1862 is deduced to the plaintiffs after this manner. Daniel Pursel died in about the year 1868, intestate, leaving six heirs. These heirs entered into the modifying agreement of 1883. A two-sixths interest is in the plaintiffs.

The mining rights title of lessees passed from them to the Pennsylvania Iron Company, which, as already mentioned, was the owner of the furnaces. The title to the mineral rights, together with the ownership of the furnaces, then again passed from the Pennsylvania Iron Company to the Montour Iron

& Steel Company, which latter company was in possession as owner of mining rights and furnaces at the time of the execution of the 1883 agreement, and also at the time of the last payment of royalties, and the abandonment of the mines in 1889, and until after the dismantling of the furnaces.

The Montour Iron & Steel Company became insolvent. Judgment for a large sum was obtained against the company by 'the Reading Iron Company, the present defendant. Under a vend. ex. issued upon this judgment and another writ of vend. ex. several tracts of land belonging to the defendant in the judgment were sold by the sheriff in 1895, together with whatever real estate interest the defendant had in the Pursel lands, and a sheriff's deed was made to the Reading Iron Company therefor. The sheriff's vendee entered into possession of the lands sold to it other than the Pursel lands. Of these lands it never took possession by possessory proceedings, action or otherwise, and never exercised any right of ownership therein. The Reading Iron Company, the defendant in this action, was also the defendant in the prior action brought in 1909. By its affidavit of defense filed in that action it disclaimed title to the property, for the reason that no title had passed to it by the sheriff's deed, all interest of the defendant in the property which had been sold having ended long before the entry of judgment.

Title to what we have called the surface rights descended upon the death of Daniel Pursel to his six children, of whom William R. Pursel was one. The whole title later vested in William R. Pursel through conveyances from the other heirs before the agreement of 1883, and he was in the possession and occupancy as owner and living in person upon the property from before that date to long after the abandonment of the mine and the dismantling of the mining equipment in 1889.

The minor facts referred to other than those incidentally stated in the foregoing recital of facts and the significance attached to them by the party advancing the evidence by which they are made to appear, are these:

On May 17, 1883 (shortly after the agreement of 1883), William R. Pursel was constituted the attorney in fact of all the other lessors. The significance of this, in the view of defendant, is that he thus became their representative, so that they are bound by anything which would bind him. The letter of attorney, however, is restricted to the sole power to demand and collect the royalties. He was also at the time cotenant with them of the estate in common which they all had in the land. His declarations by word or act would therefore be evidence against all so far as such relation makes them evidential. William R. Pursel had knowledge of what was done in the way of the abandonment of the mine, and the dismantling of the mining equipment, and the removal of the property of the lessees, and of all that transpired upon the premises.

The Reading Iron Company, after the sheriff's deed to them, operated rolling mills at Danville, in Montour county. These mills were in charge of a superintendent. The road supervisors of the township, in which the Pursel lands are situate, complained to this superintendent at Danville that travel on the public highway was endangered by the sinking of the land over the abandoned Pursel slope. By direction of the superintendent workmen of the present defendant filled in the depressions complained of. Whatever significance this fact might have is lessened, if not destroyed, by the agreed fact that the superintendent had no authority outside the rolling mills, and that the defendant neither authorized nor knew of these acts, and the further agreed fact that the defendant "never entered into possession of the premises or did any act to care for or conserve the property in any way whatever."

On September 25, 1905, William R. Pursel sold the stone which had been part of the railroad construction in the abutments and culverts and the stone in the mine.

### Discussion.

The claim sued for in this action is the two-sixths share of the plaintiffs in the minimum royalties reserved by the indenture of 1862. No question is raised of the right to thus divide the claim for royalty. The total claim, exclusive of interest, is apparently $15,000. As the claim is for one-third of 17 years' royalties, it is not clear why claim has been made for this sum. This,

however, is of no importance as the parties have agreed upon the correctness of the figures. A number of very interesting questions, which in the view of counsel arise out of this record, have been discussed. We do not feel called upon to follow counsel in this discussion, because in the view we take of the case, it is disposed of by findings of fact. With the exception of certain features of the agreements of 1862 and 1883, we are in accord with the construction placed upon these contracts by counsel for plaintiff. We see no justification in this record for finding the fact which is the necessary support of one of the main positions of the defense. We think it clear there was no obligation on the part of the lessees to mine after the mining operations had been found to be unprofitable. The indenture of 1862 gave them, however, the ores, and to this extent an interest in the lands. The obligation to pay the minimum rental was coterminous with this interest. This obligation could be ended, by their act, only by a reconveyance or relinquishment of this interest. This surrender, so far as the evidence discloses, they never made by the deed or notice required. Whether there is such a privity of estate between the original lessees and the present defendant as to visit upon the latter responsibility for the performance of the covenants of the former (which the defendant denies), we do not feel required to find. We, therefore, do not pass upon this question.

There are two facts (either of which is decisive of this case), each of which we think too clearly appear. When the lessees ceased mining operations and refused to pay further royalties (which we find as a fact they did), we think it was the right of the lessors to re-enter and oust the lessees. Whether it was their right or not, they might in fact do it. After ouster, lawful or otherwise, the lessors could not exact the payment of the rent. This ouster and re-entry we think beyond all question took place and so find. This is one of the decisive facts to which reference is above made. All the facts and circumstances of the case and the situation of the parties indicate this, and certain evidential facts prove it to a moral certainty. Two will suffice to make this clear. If the relation of the parties as lessors and lessees had ended and only in that event and upon the payment of all rentals due, the lessees might remove their property from the premises. A settlement was made in 1889 of all accounts to that date, and lessees dismantled the mining plant and removed all their property from the premises. This was so done that we not only feel justified in finding, but feel compelled to find, that it was with the full knowledge and consent of the lessors, and it is admitted in substance, if not formally, that such was the case. The estate of the lessees could have been ended by lessors only by a re-entry. Such a re-entry did in fact take place, and the lessees acquiesced in this assertion of the right of the lessor. The consequences must be accepted by both, one of which is that the lessor could not thereafter claim any future rent.

The other of the two evidential facts is this: One of the lessors took possession of and sold a part of the railroad construction erected by the lessees. There is no presumption that this act was tortious. The assertion of the right to this material was therefore a declaration by one cotenant (which is evidence against all) that the lessors had re-entered into possession, and the estate of the lessees was gone. Again, the agreement of 1883 clearly meant that no rental should be paid for unmined ores when the furnaces were out of blast continuously for a time exceeding one month. During the whole period covered by this claim the furnaces were out of blast. This is the other decisive fact indicated. Nothing more is required than to state this fact.

The conclusion to which these views lead is that judgment be entered against the plaintiff and in favor of the defendant, with costs. We cannot, however, withhold the observation that the conclusion reached has the sanction of common sense judgment. The claim is not only one which without unfair characterization may be termed stale, but there is this feature of it worthy of remark. The claim is now a large one. It had been allowed to accumulate without demand until after it had been running against this defendant for 13 years. If it had been promptly made the opportunity would have been afforded the defendant either to have secured possession or to have surrendered the property. If the sheriff's grantee had sought to enforce possession it could not have been successful if the lessors had resisted the attempt.

The consequence of requiring the defendant to now pay would be to compel them to pay this large sum' for which they would have received nothing.

We append the only findings of fact and conclusions of law which are thought necessary.

### Findings of Fact.

1. The facts stated in the foregoing opinion are found as stated.

2. On or about June, 1889, a full settlement of all royalties or rentals was made between the parties, and there was a re-entry upon the demised premises by the lessors and an ouster of the lessees which was acquiesced in and accepted by them.

3. The smelting furnaces referred to in the agreement of 1883 were all out of blast continuously during the whole time for which royalties or rent is claimed in this suit.

### Conclusions of Law.

1. The ouster of lessees and re-entry by lessors upon the demised premises ended all interest and estate of the lessees in the lands of lessors and lessees' right to the ores in or upon the land and their right to mine the same and no rental or royalties were thereafter payable.

2. No rent or royalty was payable by the lessees or defendant during the time the smelting furnaces were out of blast and none claimed in this action is payable.

3. The defendant is entitled to judgment, with costs.

Reynolds D. Brown, of Philadelphia, Pa., James M. Davis, of Camden, N. J., and Malcolm Lloyd, Jr., of Philadelphia, Pa., for plaintiffs in error.

Wm. Clarke Mason, of Philadelphia, Pa., and Jefferson Snyder, of Reading, Pa., for defendant in error.

Before BUFFINGTON, McPHERSON, and WOOLLEY, Circuit Judges.

WOOLLEY, Circuit Judge. [1] The matter out of which this controversy arose is stated at length in the opinion of the District Court. Several questions are presented, the principal one being whether the lease sued upon had been' terminated by predecessors of the parties. A decision upon this question in the affirmative disposes of the others.

The case was tried by the court without the intervention of a jury on a state of facts largely agreed upon. The submission was general, authorizing the court to enter judgment "according as the·court may be of opinion that the plaintiffs on the one hand or the defendant on the other are entitled to a judgment upon all the facts as thus ascertained." These facts relate generally to the existence of the lease and to its termination. While the conflict in the court below was waged about the issue whether the lease was terminated by delivery of a written notice (the specific method prescribed by its terms), neither the facts nor the submission restrict the decision to that issue. The facts relate and the submission extends to a termination of the lease by any legal means. The District Court found that the lease was terminated, but that it was not terminated by the sole act of the lessee, either in 'delivering written notice of surrender or by abandoning the demised premises. This finding relieves us of the necessity of reviewing the line of Pennsylvania decisions against the termination of leases (notably of oil lands) by abandonment or without notice, cited by the plaintiff in error (Double v. Union H. & L. Co., 172 Pa.

389, 33 Atl. 694; Ahrns v. Chartiers Gas Co., 188 Pa. 249, 41 Atl. 739; Wilson v. Philadelphia Co., 210 Pa. 484, 60 Atl. 149), if the testimony supports a finding that the lease was legally terminated in another way. Our consideration is therefore directed mainly to the error assigned to the court in affirming the prayer that under the facts the defendant is entitled to judgment.

[2] The District Court found that mining operations were suspended by the termination of the lease, and that the lease was terminated by ouster of the lessee upon re-entry by the lessors. If this was the only finding of fact upon which the court predicated its judgment, we would be constrained to direct a reversal, for we have not found in the testimony a distinct act of ouster in its purely technical sense. The elemental idea of ouster is dispossession, which in turn means ejectment or exclusion of one from the realty; if not to his injury, then certainly against his interest and without his consent. But in finding ouster by the lessors as a fact, the District Court went further and in the same connection found as a fact that the ouster was acquiesced in and accepted by the lessee, the two findings being joined in the following paragraph:

"On or about June, 1889, a full settlement of all royalties or rentals was made between the parties, and there was a re-entry upon the demised premises by the lessors and an ouster of the lessees which was acquiesced in and accepted by them."

From this language it appears that while the court found a re-entry by the lessors, it did not mean a re-entry in its technical sense, for the re-entry it found was not adverse to or against the will or interest of the lessee, but on the contrary met with the lessee's acquiescence and acceptance. The court clearly meant what the evidence amply shows that the parties acted in concert, that the conduct of each was consistent with that of the other, and that the conduct of both was based upon mutual consent. Therefore, except for the word ouster, if viewed in its technical sense, we discern no error by the District Court in reaching a conclusion from the admissible inferences of the testimony, that the lease was terminated by the mutual consent of the parties. This we conceive to be the substance of the court's decision.

Owing to the lapse of time and the death of parties, the trial court was not aided by direct testimony in deciding the question of the termination of the lease, but was left very much to inferences to be drawn from the conduct of parties. While there was no occasion to interpret the terms of the lease in connection with the question of its termination and to that end invoke the rule that the interpretation which the parties themselves had placed upon it by their conduct should prevail (Otis v. Coal Co., 199 Fed. 86, 117 C. C. A. 598; Myers' Estate, 238 Pa. 195, 86 Atl. 89), the learned trial judge, without expressly so stating, evidently applied the principle of that rule to the matter before him, and decided the matter as it was shown that the parties by their conduct had treated it.

If the parties in their acts treated the lease as terminated, the court did not likely go astray if it viewed the lease in the same light in which they regarded it. On the other hand, if the conduct of one

party was not consistent with that of the other and failed to show a common understanding that the lease was ended, then different inferences would compel a different method of solution with probably a different result.

Something happened in 1889 that changed the relations of the parties to the lease. Something transpired at that time between the lessors and the lessee which at least suspended all operations under the lease. Of this the evidence is quite conclusive. It is equally certain that the thing which resulted in the suspension of operations was done with the consent of both the lessors and the lessee. Just what was done to cause the suspension is not entirely clear, and whether the acts of the parties in suspending operations went further and put an end to the lease is not established by direct evidence. But the extent of the transaction and its legal effect, we think, may be gathered from its proper inferences and from inferences properly arising from the conduct of the parties subsequently pursued. In fact, if this case is capable of a correct decision upon the testimony submitted, this is the only way to decide it. Without reciting or summarizing the testimony, it is sufficient to say that, viewing the reasons leading up to the transaction of 1889 and giving to that transaction and to the conduct which the parties pursued thereunder all their admissible inferences, we are satisfied that the lease was not merely suspended but was terminated, and that it was terminated not by formal notice or abandonment, but by mutual consent of the parties. This is shown by the trend of affairs in mining and smelting in that district and by the losses which in changed conditions were attendant upon both. It is evidenced by the settlement respecting royalties coincident with the stopping of mining operations which had all the appearance of a settlement intended by the parties to be final. It is further shown by the subsequent omission of the lessee to pay and of the lessors to demand royalties for a long term of years, the dismantlement of the plant by the lessee and the removal of its implements observed and unopposed by the lessors, such dismantlement being provided for by the lease but being permissible only after its termination, the withdrawal from the property and its surrender by the lessee, re-entry by certain of the lessors and subsequent sale of a part which under the lease would belong to the lessee, and the entire acquiescence of each party in the acts and conduct of the other. By this conduct, which included relinquishment by the lessee of all rights in the property and resumption by the lessors of rights that had theretofore belonged to the lessee, we are led to believe that the parties treated the lease as ended. Though the lease contained a provision for surrender upon written notice, such a provision did not preclude the parties from waiving it and from ending the lease by other means equally legal. This we think the parties did by mutually consenting to its termination. The proper inferences from the conduct of the parties support this conclusion, and in adopting the interpretation of the parties as its own, the trial court committed no error.

The judgment below is affirmed.