## TUCKER v. CANFIELD et al.

(Circuit Court of Appeals, Eighth Circuit. November 17, 1921.)

No. 5752.

1. Mines and minerals ⊂⇒77—Cessation of operation, lapse of time, and notice of nonproduction may show abandonment.

Because of the peculiar nature of leases for the exploration and production of oil and gas, it is the lessee's duty to use reasonable diligence to obtain production, and a cessation of operation, lapse of time, and notice of nonproduction may show an abandonment.

**2. Mines and minerals ⬤⟿77—Evidence held to sustain finding assignee had abandoned lease, when assignors acquired new lease.**

Evidence that the assignee of an oil lease had sold to the assignors the gas being produced, that he had refused to explore further, though he knew that the supply was exhausted, and that the lease would terminate when production ceased, *held* to sustain the court's finding that he had abandoned the lease when the assignors, after the gas had ceased to flow, took a new lease covering the same land, under which they deepened the well and struck oil, so that the assignors did not hold the new lease as trustees for the assignee.

Appeal from the District Court of the United States for the Western District of Oklahoma; Frank A. Youmans, Judge.

Suit by W. B. Tucker against G. W. Canfield and others, to have defendants held to be trustees for the benefit of plaintiff of an oil and gas lease. From a decree dismissing the bill, plaintiff appeals. Affirmed.

The plaintiff below brought this suit seeking to have the defendants Canfield held to be trustees for his benefit of an oil and gas lease, which had been executed to the Canfields as lessees. Upon a final hearing a decree was entered dismissing his bill, and the plaintiff appeals. The Canfields were lessees from the owners of 80 acres of land in Payne county, Okl., by a written lease conveying the oil and gas under the surface, with the right to operate for its extraction. The lease was executed on September 6, 1912, and was for the term of five years, and as much longer as oil and gas were found in paying quantities, and provided for a royalty of one-eighth of the oil produced and for a payment to the lessors of $150 per year for each well so long as gas was sold therefrom, and for a supply of gas for domestic use in one dwelling on the land. In case no well was completed within 12 months, the lease was to be void, unless the lessees should pay a rental of $1 per acre until a well was completed. The lessees held the lease without completing a well until January 6, 1917. At that date they assigned the lease to plaintiff, who agreed to perform all the lessees' covenants in the original lease, so as to keep the lease in force and to pay to the assignors one-eighth of any oil and one-fourth of any gas produced and sold from the land. The assignee agreed to pay the cost of all operations and developments under the lease. At the same time the assignors agreed to purchase all the oil produced from the land by the assignee under the lease. The plaintiff drilled a well on the land which produced a small flow of gas in May, 1917. On June 8, 1917, the parties entered into a written agreement by which the plaintiff sold to the Canfields for $10,000 all the gas produced from this well, and the equipment he had used, including the rig, casing in the well, tank, and a pipe line. The agreement provided that the lease should be kept in force and that the lease contracts or agreements held by them should not be affected. The Canfields agreed to pay any royalties due from the gas well, and that plaintiff should have the right at any time to re-enter the premises to deepen this well, provided that he preserved the gas produced without material reduction of its amount.

In a few days the plaintiff left for Beaumont, Tex., where he resided. The Canfields used the gas produced from the well and made the payments required. The following September the five-year term of the lease expired, but the gas well continued to produce. The next January the plaintiff received a letter from the Canfields, inquiring if he would sell his interest in the lease. The plaintiff did not answer this letter, but early in April went to visit the Canfields, and inspected the well, and made inquiries as to its production and prospects. Plaintiff was informed that the well was not producing much then, and that it would not produce much longer. The plaintiff soon returned to his home in Beaumont, and in the latter part of April the well quit producing gas. A few days later the Canfields mailed a letter properly addressed to him,

⬤⟿For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

notifying him that the well had quit flowing. Nothing was heard from him, and in January, 1918, the Canfields made a verbal lease from the owners of the greater portion of this land, for the purpose of exploring for and producing oil and gas, the term to continue as long as either was produced from the land and upon stipulated payments of rent and royalty. This lease was later reduced to writing and signed. In the latter part of April, 1918, the Canfields began to deepen the well on the land, and expended several thousand dollars in the operation. A small flow of oil was struck the last of June. The plaintiff saw a newspaper report of oil being found, and in July telegraphed an inquiry to the Canfields whether they were drilling the gas well deeper, and an answer informed him that it had been drilled deeper and oil had been found. The plaintiff then came to the scene of operations and after unsuccessful negotiations for settlement began this suit.

Preston C. West, of Tulsa, Okl. (Roger S. Sherman and A. A. Davidson, both of Tulsa, Okl., on the brief), for appellant.

Bird McGuire, of Tulsa, Okl. (John Devereux, of Tulsa, Okl., on the brief), for appellees.

Before SANBORN and CARLAND, Circuit Judges, and MUNGER, District Judge.

MUNGER, District Judge (after stating the facts as above). [1] Appellant's claim is that, because of the relationship between the Canfields and plaintiff, the Canfields were in a fiduciary position toward him, and that the benefit of the new lease taken by the Canfields inured to plaintiff. Whatever relationship there was between these parties had grown out of the dealings which have been set forth relating to this land and to the gas well thereon. It is plaintiff's theory that this relationship continued to the time when the Canfields became lessees in the new lease from the owners of the land. The trial court, after hearing the evidence, made a finding of the facts, and found that the plaintiff had abandoned the lease which had been assigned to him and that the lessors had accepted the surrender. Because of the peculiar nature of such leases for the exploration and production of oil and gas, it is the duty of the lessee to use reasonable diligence to obtain production, so that the income contemplated by both parties will be obtained, and a cessation of operations, lapse of time, and notice of nonproduction may show an abandonment of the lease on the part of the lessee. Brewster v. Lanyon Zinc Co., 140 Fed. 801, 811, 813, 72 C. C. A. 213; Logan Natural G. & F. Co. v. Great Southern G. & O. Co., 126 Fed. 623, 625, 626, 61 C. C. A. 359; People's Gas Co. v. Dean, 193 Fed. 938, 942, 113 C. C. A. 566; Pursel v. Reading Iron Co., 232 Fed. 801, 808, 146 C. C. A. 657; Barnsdall v. Boley (C. C.) 119 Fed. 191, 199; Roach v. Junction Oil & Gas Co. (Okl.) 179 Pac. 934.

[2] At the trial the following facts were either established or supported by competent evidence: After the well began its flow of gas, the plaintiff claimed the flow was too light to use, and threatened to pull out the casing and to plug the well, unless he could make a sale of it. The Canfields then purchased it, and all of the plaintiff's property on the land connected with it, leaving to plaintiff the lease and the right to explore further for oil and gas. The plaintiff then returned to his home in Texas, but returned the 1st of April, 1918, in reply to

the inquiry from the Canfields, made in January, as to a possible sale of his interest. He inspected the well, learned that the supply of gas was very low, refused to deepen it or to drill another, but suggested that he might deepen this well, if some further concessions as to royalty were made, and told one of the owners of the land that, if a well then being drilled by other parties about three-fourths of a mile away was successful, he might drill deeper. This well was unsuccessful, as no oil or gas was found. The plaintiff knew that a large number of wells were producing or being drilled near this property and in the same section of land. The plaintiff then again returned to his home, and within a month the well ceased to flow, and the Canfields mailed the letter to plaintiff, notifying him that the well had ceased to produce. No reply was received, nor was there any communication between plaintiff and the Canfields, or the owners of the land, for about 15 months, nor until the Canfields had taken a new lease, and had deepened the well and found oil. There was some conflict of testimony as to some of these circumstances, and some testimony by the plaintiff seeking to excuse his delay; but it is not considered to be sufficient to overcome the legal presumption that the findings of the court are correct. The facts sufficiently show that the plaintiff had surrendered his lease, and that there was no relationship toward him by the Canfields at the time they took the new lease which requires them to be held to be trustees for his benefit. It was the plaintiff's duty to deepen the well, or to drill another and by some means to maintain production of oil or gas in paying quantities, if he desired that his lease should continue in force.

The decree will be affirmed.